*ORAL ARGUMENT NOT YET SCHEDULED*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA

_____

## No. 12-1158
_____

**Southwest Power Pool, Inc.,**
*Petitioner*

**v.**

**Federal Energy Regulatory Commission,**
*Respondent.*

_____

**On Petition for Review from the**
**Federal Energy Regulatory Commission**

_____

**OPENING BRIEF OF PETITIONER**
**SOUTHWEST POWER POOL, INC.**

_____

Barry S. Spector
Jeffrey G. DiSciullo
Wright & Talisman, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3802
(202) 393-1200 Telephone
(202) 393-1240 Facsimile

Attorneys for
Southwest Power Pool, Inc.

**October 2, 2012**

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

**Parties and Intervenors**

The following is a list of all parties and intervenors who have appeared before this Court in this appeal:

American Electric Power Service Corporation

Arkansas Electric Cooperative Corporation

Bayou Cove Peaking Power LLC

Big Cajun I Peaking Power LLC

Coalition of Midwest Transmission Customers

Cottonwood Energy Company LP

Entergy Services, Inc.

Kansas City Power & Light Company

KCP&L Greater Missouri Operations Company

Louisiana Generating LLC

Mid-Kansas Electric Company, LLC

Midwest Independent Transmission System Operator, Inc.

Nebraska Public Power District

NRG Power Marketing, LLC

NRG Sterlington Power LLC

Sunflower Electric Power Corporation

The Empire District Electric Company

The following persons and entities appeared before the Federal Energy Regulatory Commission in the underlying administrative proceedings:

American Electric Power Service Corporation

Arkansas Electric Cooperative Corporation

Arkansas Public Service Commission

Associated Electric Cooperative, Inc.

Basin Electric Power Cooperative

Calpine Corporation

Cleco Power LLC

Coalition of Midwest Transmission Customers

Consumers Energy Company

Arkansas Cities[1]

Council of the City of New Orleans, Louisiana

DC Energy Midwest, LLC

---

[1]    Arkansas Cities are comprised of Conway Corporation, West Memphis Utilities Commission, City of Osceola, Arkansas, City of Benton, Arkansas, the Hope Water & Light Commission, and the City of Prescott.

Designated FirstEnergy Companies[2]

Duke Energy Corporation

East Texas Cooperatives[3]

Edison Mission Energy

Electric Power Supply Association

Entergy Services, Inc.

Exelon Corporation

Genon Power Midwest, LP

Illinois Commerce Commission

ITC Companies[4]

Kansas City Power & Light Company and KCP&L Greater Missouri

Operations Company

---

[2]   Designated FirstEnergy Companies are comprised of FirstEnergy Service Company – on behalf of its affiliates American Transmission Systems, Inc., FirstEnergy Solutions Corp., Ohio Edison, Toledo Edison, The Illuminating Company, and Pennsylvania Power Company.

[3]   The East Texas Cooperatives are comprised of East Texas Electric Cooperative, Inc., Northeast Texas Electric Cooperative, Inc., Sam Rayburn G&T Electric Cooperative, Inc., and Tex-La Electric Cooperative of Texas, Inc.

[4]   ITC Companies are comprised of International Transmission Company d/b/a ITCTransmission, ITC Midwest LLC, Michigan Electric Transmission Company, LLC, and ITC Great Plains, LLC.

L-M Municipals[5]

Lincoln Electric System

Louisiana Public Service Commission

Louisville Gas & Electric Company and Kentucky Utilities Company

Midwest Independent System Operator, Inc.

Midwest ISO Transmission Owners

Mississippi Public Service Commission

Missouri Joint Municipal Electric Utility Commission

Nebraska Public Power District

NRG Companies[6]

Oklahoma Gas and Electric Company

Omaha Public Power District

PJM Interconnection, L.L.C.

Public Utility Commission of Texas

---

[5]     L-M Municipals are comprised of Lafayette Utilities System, Louisiana Energy and Power Authority, the Municipal Energy Agency of Mississippi, Mississippi Delta Energy Agency, Public Service Commission of the city of Yazoo City, Mississippi and the Clarksdale Public Utilities Commission of Clarksdale, Mississippi.

[6]     NRG Companies are comprised of NRG Marketing LLC, Bayou Cove Peaking Power LLC, Big Cajun I Peaking Power LLC, Louisiana Generating LLC, NRG Sterlington Power LLC, and Cottonwood Energy Company LP.

iv

South Mississippi Electric Power Association

Southwest Power Pool, Inc.

Southwestern Power Administration

Southwestern Power Resources Association

Sunflower Electric Power Corporation and Mid-Kansas Electric

Company, LLC

Tennessee Valley Authority

The Detroit Edison Company

The Empire District Electric Company

Union Power Partners, L.P.

Westar Energy, Inc.

Western Farmers Electric Cooperative

Wisconsin Electric Power Company

Xcel Energy Services, Inc.[7]

---

[7]     Xcel Energy Services, Inc. filed on behalf of itself and on behalf of its utility operating company affiliates Northern States Power Company, a Minnesota corporation, Northern States Power Company, a Wisconsin corporation, and Southwestern Public Service Company.

**Rulings Under Review**

The Commission orders under review are:

- *Midwest Independent Transmission System Operator, Inc.*, Order on Petition for Declaratory Order, Docket No. EL11-34-000, 136 FERC ¶ 61,010 (July 1, 2011); and

- *Midwest Independent Transmission System Operator, Inc.*, Docket No. EL11-34-001, Order on Rehearing, 138 FERC ¶ 61,055 (Jan. 26, 2012).

**Related Cases**

This case is not pending in any other court, and is not related to any other case in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT
## OF SOUTHWEST POWER POOL, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of this Court, Petitioner Southwest Power Pool, Inc. ("SPP") hereby submits the following corporate disclosure statement.

SPP is a non-profit corporation organized under the laws of the state of Arkansas with its principal place of business in Little Rock, Arkansas. SPP has no parent corporation, and because SPP is a non-profit corporation that does not issue stock, no publicly held corporation owns 10% or more stock in SPP.

Respectfully submitted,

/s/    *Barry S. Spector*
Barry S. Spector
Jeffrey G. DiSciullo
Wright & Talisman, P.C.
1200 G Street N.W., Suite 600
Washington, DC 20005-3802
(202) 393-1200 Telephone
(202) 393-1240 Facsimile

Attorneys for
Southwest Power Pool, Inc.

Dated: October 2, 2012

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................x

GLOSSARY OF ABBREVIATIONS ................................................xiv

JURISDICTIONAL STATEMENT ....................................................1

APPLICABLE STANDARDS OF REVIEW.......................................3

STATEMENT OF ISSUES .................................................................4

STATUTES AND REGULATIONS....................................................5

STATEMENT OF THE CASE.............................................................5

SUMMARY OF THE FACTS............................................................11

SUMMARY OF ARGUMENT ..........................................................13

STANDING .......................................................................................17

ARGUMENT ....................................................................................18

    1.    Having Resorted to Extrinsic Evidence to Ascertain the Meaning of Section 5.2, the FERC Was Compelled to Support Its Interpretation with Substantial Evidence and to Consider All Relevant Evidence, Not Merely Evidence that the FERC Perceived to be Consistent with Its Interpretation ..............................18

        a.    The Course of Performance Evidence Relied Upon by the Commission Supports the Exact Opposite Conclusion Reached Regarding the Intended Purpose of Section 5.2.........20

        b.    The Consideration of Course of Performance Evidence, to the Exclusion of Other Proffered Extrinsic Evidence, Is Arbitrary and Capricious......................................................26

    2.    Proper Consideration of SPP's Proffered Evidence Would Have Demonstrated the Error in the Commission's Interpretation of Section 5.2. ..................................................................................27

a.    Trade Usage and Industry Practice Evidence Comports with SPP's Interpretation. ........................................................27

b.    Disregarded Sworn Evidence by SPP's Principal JOA Negotiator Directly Contradicts the FERC's Interpretation of Section 5.2. ....................................................30

3.    FERC's Contextual Analysis of Section 5.2 Does Not Support and, in Fact, Undercuts FERC's Conclusion. .....................................33

4.    FERC's Straw-Man Argument Regarding Inferred Intentions Is Based on a Fundamental Misunderstanding of SPP's Position. .........35

CONCLUSION ........................................................................37

# TABLE OF AUTHORITIES

Page

## COURT CASES

*Ameren Services Co. v. FERC*,
330 F.3d 494 (D.C. Cir. 2003).......................................................................18

*Cajun Electric Power Coop., Inc. v. FERC*,
924 F.2d 1132 (D.C. Cir. 1991)............................................................30, 31

*Carpenters & Millwrights v. National Labor Relations Board*,
481 F.3d 804 (D.C. Cir. 2007)..........................................................................3

*Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.*,
73 F.3d 727 (7th Cir. 1996) .........................................................................19

*Colorado Interstate Gas Co. v. FERC*,
599 F.3d 698 (D.C. Cir. 2010)...................................................................18, 26

*East Texas Electric Cooperation v. Entergy Arkansas, Inc.*,
109 FERC ¶ 61,207 (2004)...........................................................................14

*El Paso Electric Co. v. FERC*,
201 F.3d 667 (5th Cir. 2000) .......................................................................20

*Exxon Corp. v. Crosby-Mississippi Resources, Ltd.*,
40 F.3d 1474 (5th Cir. 1995) .......................................................................27

*Florida Gas Transmission Co. v. FERC*,
604 F.3d 636 (D.C. Cir. 2010).................................................................3, 36

*Missouri Public Service Commission v. FERC*,
337 F.3d 1066 (D.C. Cir. 2003)........................................................................3

*Murphy v. Keystone Steel & Wire Co.*,
61 F.3d 560 (7th Cir. 1995) .........................................................................19

*Natural Resources Defense Council v. EPA*,
822 F.2d 104 (D.C. Cir. 1987).................................................................3, 14

*Pennzoil Co. v. FERC*,
645 F.2d 360 (5th Cir. 1981) .......................................................................32

*PPL Wallingford Energy LLC v. FERC*,
  419 F.3d 1194 (D.C. Cir. 2005)........................................................................3

*PSEG Energy Resources & Trade LLC v. FERC*,
  360 F.3d 200 (D.C. Cir. 2004) .............................................................25, 30

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*,
  986 F.2d 580 (1st Cir. 1993).........................................................................19

*Southwestern Electric Cooperative v. FERC*,
  347 F.3d 975 (D.C. Cir. 2003)......................................................................31

## ADMINISTRATIVE CASES

*Midwest Independent Transmission System Operator, Inc.*,
  136 FERC ¶ 61,010 (2011).......................................................1, 7, 12, 15, 35

*Midwest Independent Transmission System Operator, Inc.*,
  138 FERC ¶ 61,055 (2012)....... 1, 9, 10, 11, 13, 16, 19, 20, 24, 31, 32, 34, 35

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*,
  Order No. 888, 1991-1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,036, at 31,726-27 (1996), *order on reh'g*,
  Order No. 888-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,048, *order on reh'g*,
  Order No. 888-B, 81 FERC ¶ 61,248 (1997), *reh'g denied*,
  Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part sub nom.*
  *Transmission Access Policy Study Group v. FERC*,
  225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom.*
  *New York v. FERC*,
  535 U.S. 1 (2002)............................................................................................6

*Preventing Undue Discrimination and Preference in Transmission Service*,
> Order No. 890, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,241, *order on reh'g*,
> Order No. 890-A, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,261 (2007), *order on reh'g and clarification*,
> Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g and clarification*,
> Order No. 890-C, 126 FERC ¶ 61,228 (2009), *order on clarification*,
> Order No. 890-D, 129 FERC ¶ 61,126 (2009) ...............................................34

*Regional Transmission Organizations*,
> Order No. 2000, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,089 (1999), *order on reh'g*,
> Order No. 2000-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,092, (2000), *petitions for review dismissed sub nom.*
> *Pub. Util. Dist. No. 1 v. FERC*,
> 272 F.3d 607 (D.C. Cir. 2001).....................................................................5, 6

*Southwest Power Pool, Inc.*, 106 FERC ¶ 61,110 (2004) ...................................7, 11

*Southwest Power Pool, Inc.*, 109 FERC ¶ 61,008 (2004) .......................................11

## **STATUTES**

5 U.S.C. § 557 ................................................................................................3

5 U.S.C. § 706 ................................................................................................3

15 U.S.C. § 717r ............................................................................................3

16 U.S.C. § 824d ...........................................................................................1

16 U.S.C. § 824e ...........................................................................................1

16 U.S.C. § 825*l*.............................................................................1, 2, 3, 17

U.C.C. §2-208 (2011) ..................................................................................27

**<u>MISCELLANEOUS</u>**

Restatement (Second) of Contracts (1981) ........................................................20, 27


**\* The cases principally relied upon are noted with an asterisk.**

# GLOSSARY OF ABBREVIATIONS

| Term /Abbreviation | Definition |
|---|---|
| AECI | Associated Electric Cooperative, Inc. |
| APSC | Arkansas Public Service Commission |
| *CIG* | *Colorado Interstate Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010) |
| Commission or FERC | Federal Energy Regulatory Commission |
| ESA | Entergy System Agreement |
| FPA | Federal Power Act |
| Initial Order | *Midwest Independent Transmission System Operator, Inc.,* 136 FERC ¶ 61,010 (2011) (R.73, JA __) |
| JOA | Joint Operating Agreement between MISO and SPP |
| MISO | Midwest Independent Transmission System Operator, Inc. |
| MISO-PJM JOA | Joint Operating Agreement between MISO and PJM |
| Mallinger Aff. | Affidavit of Thomas J. Mallinger on Behalf of the Midwest Independent Transmission System Operator, Inc. (R.1, JA__) |
| Monroe Aff. | SPP Protest at Exhibit A, Affidavit of Carl A. Monroe on Behalf of Southwest Power Pool, Inc. (R.41, JA __) |
| NAESB | North American Energy Standards Board |
| NERC | North American Electric Reliability Corporation |

| | |
|---|---|
| OATT or tariff | Open Access Transmission Tariff |
| Order No. 888 | *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 1991-1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *reh'g denied*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) |
| Order No. 890 | *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,241, *order on reh'g*, Order No. 890-A, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,261 (2007), *order on reh'g and clarification*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g and clarification*, Order No. 890-C, 126 FERC ¶ 61,228 (2009), *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009). |
| Order No. 2000 and Order No. 2000-A | *Regional Transmission Organizations*, Order No. 2000, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *petitions for review* |

|  |  |
|---|---|
|  | *dismissed sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) |
| Petition | MISO's Petition for Declaratory Order (R.1, JA __) |
| PJM | PJM Interconnection, L.L.C. |
| Rehearing Order | *Midwest Independent Transmission System Operator, Inc.,* 138 FERC ¶ 61,055 (2012) (R.84, JA __) |
| RTOs | Regional transmission organizations |
| SPP | Southwest Power Pool, Inc. |
| SPP Protest | Motion to Intervene and Protest of Southwest Power Pool, Inc., Docket No. EL11-34-000 (May 9, 2011) (R.41, JA __) |
| SPP Rehearing Request | Request for Rehearing or, in the Alternative, Clarification of Southwest Power Pool, Inc., Docket No. EL11-34-000 (Aug. 1, 2011) (R.77, JA __) |

## JURISDICTIONAL STATEMENT

In the orders under review, the Federal Energy Regulatory Commission ("Commission" or "FERC") granted the Midwest Independent Transmission System Operator, Inc.'s ("MISO") Petition for Declaratory Order ("Petition") concerning the interpretation of section 5.2 of the Joint Operating Agreement ("JOA") between MISO and Southwest Power Pool, Inc. ("SPP"). The JOA is a filed rate schedule of both MISO and SPP, bearing the designations "Midwest ISO Second Revised Rate Schedule FERC No. 6" and "Southwest Power Pool, Inc., Second Revised Rate Schedule FERC No. 9," respectively. Terms and conditions of the JOA, including any proposed changes thereto, are subject to the FERC's jurisdiction under the Federal Power Act ("FPA"). *See* 16 U.S.C. §§ 824d and 824e.

The Commission issued an order granting MISO's Petition on July 1, 2011. *Midwest Independent Transmission System Operator, Inc.*, 136 FERC ¶ 61,010 (2011) ("Initial Order") (R.73, JA__). In accordance with section 313(a) of the FPA, SPP timely sought rehearing of the Initial Order. 16 U.S.C. § 825*l*(a). On January 26, 2012, the Commission denied rehearing. *Midwest Independent Transmission System Operator, Inc.*, 138 FERC ¶ 61,055 (2012) ("Rehearing Order") (R.84, JA__). SPP timely filed a petition for review with this Court pursuant to section 313(b) of the FPA. 16 U.S.C. § 825*l*(b). The orders under

review are final orders and, therefore, this Court has jurisdiction pursuant to section 313(b) of the FPA. *Id.*

## APPLICABLE STANDARDS OF REVIEW

The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), provides that agency actions are unlawful if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Application of this standard requires that an agency's decision be set aside if it lacks a coherent and rational connection between the facts found and the choices made.  *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 639 (D.C. Cir. 2010).  Further, an agency acts arbitrarily and capriciously when it "ignores important arguments or evidence," *Natural Resources Defense Council v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987), fails to address all material issues of fact or law presented on the record, 5 U.S.C. § 557(c), or offers no explanation "why it rejected evidence that is contrary to its findings." *Carpenters & Millwrights v. National Labor Relations Board*, 481 F.3d 804, 809 (D.C. Cir. 2007).  Factual findings by an agency are conclusive "if, *but only if*, they are 'supported by substantial evidence' in the record." *Mo. Pub. Serv. Comm. v. FERC*, 337 F.3d 1066, 1070 (D.C. Cir. 2003) (citing 15 U.S.C. § 717r(b)) (emphasis added); *see also* Federal Power Act, § 313(b), 16 U.S.C. § 825*l*(b).  An agency order that does not respond to serious and legitimate objections cannot be said to be the product of reasoned decision-making. *See, e.g., PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005).

3

## STATEMENT OF ISSUES

1.      Whether the Commission's interpretation of section 5.2 of the JOA between MISO and SPP, to allow MISO to use SPP's transmission system to provide service to MISO's own internal loads, was arbitrary and capricious and not the product of reasoned decision-making.

2.      Whether the Commission's reliance on "course of performance" evidence consisting of a single past use of section 5.2 that SPP showed to be consistent with *SPP's, not MISO's,* interpretation of the JOA rendered the Commission's decision in favor of MISO arbitrary and capricious, not the product of reasoned decision-making, and unsupported by substantial evidence in the record.

3.      Whether the Commission's refusal to consider SPP's extrinsic evidence regarding common industry usage of the term "contract path" used in the JOA and the negotiating intentions of SPP was arbitrary and capricious and not the product of reasoned decision-making.

4.      Whether the Commission's finding that the "context" of section 5.2 supported MISO's interpretation, not SPP's, was arbitrary and capricious, not the product of reasoned decision-making, and unsupported by substantial evidence in the record.

5.      Whether the Commission's finding that SPP's proposed interpretation of section 5.2 would mean that the provision only benefitted third parties when it in

4

fact would enable the parties to the JOA to make purchases from, and sales to, others, rendering its decision arbitrary and capricious, not the product of reasoned decision-making, and unsupported by substantial evidence in the record.

6.     Whether the Commission's refusal to conduct a hearing or other investigation to consider the extrinsic evidence of the meaning of section 5.2 of the JOA, including the common industry usage of the term "contract path," the parties' intentions in negotiating the JOA, and the parties' course of conduct, was arbitrary and capricious and not the product of reasoned decision-making.

**STATUTES AND REGULATIONS**

The relevant statutory provisions are reproduced in a separate addendum bound with this brief, as permitted by D.C. Circuit Rule 28(a)(5).

**STATEMENT OF THE CASE**

Both MISO and SPP operate as FERC-approved regional transmission organizations ("RTOs"), pursuant to Order No. 2000.[1]  In Order No. 2000, FERC encouraged the formation of RTOs as a way to promote greater competition within the electric industry.  To that end, vertically integrated utilities ceded functional

---

[1]     *Regional Transmission Organizations*, Order No. 2000, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,092, (2000), *petitions for review dismissed sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

5

control of their transmission assets to independent RTOs, who were then to manage and operate these assets on a regional basis.

Utilities that join an RTO are commonly referred to as "transmission-owning members" of the RTO. Their transmission assets, once control is ceded to the RTO, become embedded within the RTO's footprint and operated on an integrated basis as a single system pursuant to the RTO's open-access transmission tariff ("OATT" or "tariff").

With the development of RTOs came the need for mechanisms and agreements to coordinate the provision of transmission services across and between RTO boundaries. Such regional boundaries exist not only between RTOs, but also between RTOs and the service territories of non-RTO electric utilities, often referred to as bordering "control areas" or "balancing authority" areas.[2]

---

[2]     *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 1991-1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,036, at 31,726-27 (1996), *order on reh'g*, Order No. 888-A, 1996-2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *reh'g denied*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part and remanded in part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002); *see also* Order No. 2000 at 31,167; Order No. 2000-A at 31,382.

The JOA is a coordination agreement between two neighboring RTOs, SPP and MISO. It was designed primarily to promote the cooperative sharing of reliability practices and data between SPP and MISO so that the respective transmission systems may be operated in a reliable manner.[3] As part of this agreement, the parties also provided, in section 5.2, for the shared use of each other's contract path transmission capacities when each of the RTOs has a "contract path to the same entity."

In May 2011, Entergy announced plans to join MISO. Entergy Arkansas, one of several Entergy operating subsidiaries, was the first to propose moving into MISO. Entergy Arkansas had provided notice in 2005 that it would exit the Entergy System Agreement ("ESA")[4] effective December 31, 2013.

The announcement to join MISO followed an order of the Arkansas Public Service Commission ("APSC") requiring Entergy Arkansas to submit to the APSC successor arrangements that would govern future operations. In connection with the anticipated integration of Entergy Arkansas into MISO, Entergy and MISO

---

[3]    *See* Motion to Intervene and Protest of Southwest Power Pool, Inc., Docket No. EL11-34-000, at Exhibit A, Affidavit of Carl A. Monroe on Behalf of Southwest Power Pool, Inc. ¶ 18 (May 9, 2011) ("SPP Protest" and "Monroe Aff.") (R.41, JA__); *see also Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 203 (2004).

[4]    The ESA provides for the joint planning and operation of all Entergy operating companies across the Entergy system. *See* Initial Order at P 2 (R.73, JA__).

publicly proposed to use SPP's system to enable power to flow to this new, internal portion of MISO. When SPP made clear that it did not agree that the "contract path" provision under section 5.2 permitted the use contemplated by MISO and Entergy, MISO filed the Petition.

The negotiation of the section 5.2 contract path capacity sharing provision occurred in 2004 – i.e., seven years before Entergy Arkansas and MISO announced their integration plans. Therefore, the parties could not have had in mind the specific facts posited in MISO's Petition or MISO's planned use of section 5.2 to integrate a distant utility system with which MISO is weakly interconnected as a new portion of the internal system of MISO. Whether, in fact, section 5.2 can be relied upon in the manner urged by MISO lies at the core of the instant dispute.

MISO's contention, which the Commission accepted in the orders under review, is that section 5.2 may be invoked to allow MISO to use SPP's system to reach and serve the new load that will be internal to MISO following the planned integration of Entergy Arkansas. MISO would serve its expanded system, including Entergy Arkansas's remote load which will become part of that system, using SPP's transmission capacity and interconnections with Entergy Arkansas.

In contrast, SPP contends that section 5.2 has never been applied in the manner urged by MISO and accepted by the Commission. In SPP's view, section 5.2's reference to the parties' "contract paths to the same entity" logically applies

8

only when SPP and MISO both have contract paths to the same *third party* entity.

The provision enables MISO and SPP to deal with third parties – for purchases and

sales – sharing each other's contract path capacity to do so. Under SPP's

interpretation, following Entergy Arkansas becoming an embedded part of the

internal MISO system, MISO will not have a "contract path to" Entergy Arkansas

within the meaning of section 5.2, because Entergy Arkansas will not be a third

party and MISO cannot have a contract path "to" itself.  Entergy Arkansas will be

part of MISO.  Section 5.2 has no application, and MISO has no contractual right

to use SPP's system to reach its own internal load.  Stated another way, SPP

maintains that "contract paths" within the meaning of section 5.2 exist *between*

transmission provider systems, not within their internal footprints.

   In an effort to ascertain the parties' intentions, the Commission considered

certain extrinsic evidence, but expressly "decline[d] to consider" conflicting

evidence regarding the parties' understanding of the disputed provision.  Rehearing

Order at PP 21-23 (R.84, JA__).  The Commission relied heavily on a single

"course of performance" example to support its section 5.2 interpretation.  The

Commission stated that, in its view, MISO used section 5.2 in the prior example to

serve its internal load.  However, in response, SPP explained that in the example

cited by the FERC, SPP was not interconnected with, and therefore had no

"contract path to," the internal load in question.  Therefore, MISO could not have

been using an SPP "contract path" to reach MISO internal load. Rather, this previous invocation of section 5.2 simply allowed MISO to reach another, third party, which then delivered the energy to MISO's desired destination.[5] The Commission never disputed SPP's description, but nonetheless relied on the alleged course of performance for its interpretation.

Additionally, the Commission "decline[d] to consider" evidence of trade and industry usage in considering the meaning of the term "contract path" in section 5.2 of the JOA. Rehearing Order at PP 22-23 (R.84, JA__). In excluding consideration of the evidence, the Commission stated that other available evidence – the erroneously viewed "course of performance" evidence – was entitled to "greater weight." *Id.* at P 21 n.37 (R.84, JA__). The Commission did not explain why giving "greater weight" to course of performance evidence justified its refusal even to consider other evidence offered by SPP.

The Commission also "decline[d] to consider" a sworn affidavit by an SPP officer who participated in the original JOA negotiations. *Id.* at PP 22-23 (R.84, JA__). The Commission acknowledged that the disregarded affidavit established differences as to the parties' understanding of the import of section 5.2, but noted

---

[5]     *See* Request for Rehearing or, in the Alternative, Clarification of Southwest Power Pool, Inc., Docket No. EL11-34-000, at 8-9 (Aug. 1, 2011) ("SPP Rehearing Request") (R.77, JA__).

(again) that the erroneously viewed course of performance example would trump this conflicting evidence. While declining to consider the affidavit, the Commission gratuitously observed that consideration of this conflicting evidence would not change its view regarding section 5.2 since other evidence (evidence of how a similar provision in a JOA between MISO and another RTO, PJM Interconnection, L.L.C. ("PJM"), had been administered) "suggested" that MISO and SPP had a shared understanding consistent with the interpretation urged by MISO. *Id.* at P 23 (R.84, JA__). Why that "suggested" interpretation would overcome testimony as to the actual intention of the parties was not explained.

## SUMMARY OF THE FACTS

SPP and MISO negotiated and entered into the JOA to better coordinate power flows and improve "seams" management between the two RTOs.[6] The Commission approved the JOA in 2004.[7]

Relevant to this appeal, section 5.2 of the JOA provides for the sharing of contract path capacity of SPP and MISO as follows:

> **Sharing Contract Path Capacity**. If the Parties have *contract paths to the same entity*, the combined contract path capacity will be made available for use by both Parties. This will not create new contract paths for either Party that did not previously exist. SPP will not be able to deal directly with companies with which it does not

---

[6]   *See Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 63 (2004).

[7]   *See Sw. Power Pool, Inc.*, 109 FERC ¶ 61,008 (2004).

11

physically or contractually interconnect and the [MISO] will not be able to deal directly with companies with which it does not physically or contractually interconnect. (Emphasis added).

SPP and MISO dispute the interpretation and proper application of this provision as it relates to Entergy Arkansas's system becoming an internal part of MISO. MISO filed its Petition on April 8, 2011, asking the Commission to confirm that section 5.2 of the JOA would permit MISO, following Entergy Arkansas's integration as part of the internal MISO system, to use capacity on SPP's system to reach the Entergy Arkansas load that would now be part of MISO's internal, embedded load. SPP filed a protest with the Commission challenging MISO's interpretation of this provision, SPP Protest (R.41, JA__), primarily on grounds that the logical and reasonable interpretation of section 5.2, and the one that more closely tracks trade and industry usage of the phrase "contract path," necessarily is that the shared contract path capacity must be used to reach an external, *third party* entity, not the RTO's own internal load.

On July 1, 2011, the Commission issued the Initial Order granting MISO's petition.[8] The Commission found that the sharing of contract path capacity under section 5.2 will be applicable to flows to the Entergy Arkansas portion of the MISO system when Entergy Arkansas is fully integrated into MISO, even though

---

[8]     *Midwest Indep. Transmission Sys. Operator, Inc.*, 136 FERC ¶ 61,010 (2011) (R.73, JA__).

Entergy Arkansas would not be a third party entity "to" which MISO has a contract path.  In the Rehearing Order, the Commission affirmed its prior decision and denied the requests for rehearing and clarification.[9]

SPP filed the instant petition for review challenging the Commission's interpretation of section 5.2 of the JOA.

## SUMMARY OF ARGUMENT

The analysis undertaken in the orders under review indicates that the Commission viewed the language of section 5.2, in the context of its applicability to the planned integration of Entergy Arkansas as a part of the MISO system, as ambiguous.  The Commission first determined that the JOA nowhere defines the term "contract path," Rehearing Order at 19 (R.84, JA__), and then turned to contextual and extrinsic evidence to aid its understanding of section 5.2.  In this regard, the Commission focused primarily on a single prior transaction between the parties that the Commission considered to be analogous to MISO's planned utilization of section 5.2's contract path sharing provision.

Once the Commission determined a need to rely on extrinsic evidence, it arbitrarily and selectively decided what evidence to consider and what evidence to ignore.  This was plain error.  The Commission cannot choose to examine

---

[9]    *Midwest Indep. Transmission Sys. Operator, Inc.*, 138 FERC ¶ 61,055 (2012) (R.84, JA__).

13

exclusively "course of performance" evidence, as it did, while declining to look at other evidence, particularly given SPP's showing that the single "course of performance" example cited by the Commission did not involve, and could not have involved, an analogous use of section 5.2 as claimed by the Commission. By "declin[ing] to consider" other evidence, including trade and industry usage evidence, as well as a sworn affidavit by the SPP officer principally involved in the original JOA negotiations, the Commission acted in an arbitrary and capricious manner. *Natural Res. Def. Council*, 822 F.2d at 111.

The conflicting evidence should have prompted the Commission to initiate a hearing or other investigation of the import of section 5.2 and, specifically, whether there was a shared understanding by the parties that section 5.2 could be utilized by MISO to access internal MISO load by using SPP's transmission system, as urged by MISO, once Entergy Arkansas becomes a part of the MISO system. *See East Tex. Elec. Coop. v. Entergy Ark., Inc.*, 109 FERC ¶ 61,207 (2004) (Commission sets for hearing complaint concerning contract interpretation, finding that the parties' disagreement over the meaning of contract language raised a material factual issue not appropriate for summary ruling). The Commission was obligated to consider and address the extrinsic evidence SPP proffered. It could not lawfully simply "decline to consider" the evidence presented.

14

In other respects, the Commission's findings also do not withstand scrutiny. For example, the Commission's asserted analysis of the "context" of section 5.2 actually serves to undercut, not support, the Commission's interpretation. SPP argued below that section 5.2 is found in a section of the JOA addressing concepts relevant to *point-to-point transmission service* – service between two independent entities. Yet the Commission implausibly determined that the "context" of this provision encompasses usage of SPP's transmission system for purposes of dispatching MISO's generation to serve MISO's own network loads – a service that can occur only through the utilization of internal *network transmission service,* not point-to-point service.

Additionally, the Commission found that the JOA's reference elsewhere in section 5.2 to "physical and contractual" interconnections somehow reflects the parties' understanding that contract path sharing would apply to Entergy Arkansas's internal loads within MISO's system because, according to the FERC, "both SPP and MISO would still be physically or contractually interconnected with [Entergy Arkansas]." Initial Order at P 62 (R.73, JA__). But in making this leap, the Commission takes considerable liberties with the language of section 5.2, ignoring that a contract path "to" another entity is required by the plain words of the section, and here the FERC was dealing with MISO's internal loads. The FERC also disregards clear evidence demonstrating that in common industry and

15

trade parlance (demonstrated by SPP), the term "contract path" is used to describe the path over which transmission service is reserved and scheduled between two distinct entities, not within a single entity.  Once Entergy Arkansas is embedded within, and becomes a part of, MISO, the term "contract path," as understood under common industry and trade parlance, no longer applies between Entergy Arkansas and MISO because transmission service will no longer be scheduled between MISO and Entergy Arkansas.  In simplest terms, RTO's do not have "paths" to, or interconnections with, *themselves*.  The FERC's conclusion that, post-integration, MISO would still be "physically or contractually interconnected" with Entergy Arkansas within the meaning of section 5.2 is clear error.

Finally, the Commission's assertion that MISO and SPP would not have agreed to a provision ". . . that only benefitted third parties," Rehearing Order at P 20 (R.84, JA___) indicates a fundamental misunderstanding of the facts.  SPP's interpretation of section 5.2 does not lead to such narrow benefits, but rather confirms that the JOA operates for the benefit of all MISO and SPP members by enabling them to buy from, and sell to, third parties using the shared contract path capacity of the other RTO's transmission system.  The benefits are in no way limited to the third parties that MISO and SPP can reach.  Without any support or reasoned explanation, the Commission attributes illogical outcomes to SPP's

interpretation of section 5.2, and uses those outcomes as the basis for rejecting SPP's arguments.

Because the Commission's orders are procedurally and substantively flawed, the Court should vacate the orders and direct the agency to conduct further proceedings to determine the parties' intentions with regard to the import of section 5.2.

## STANDING

SPP is aggrieved by the Commission's orders and has standing pursuant to section 313(b) of the FPA.  16 U.S.C. § 825*l*(b).  The orders under review have caused an injury in fact because they determine contractual rights and obligations in a manner adverse to SPP and contrary to SPP's understanding of the agreement memorialized in the JOA, enabling MISO to use SPP's transmission facilities in a manner contrary to what the JOA provides.

## ARGUMENT

**1.** **Having Resorted to Extrinsic Evidence to Ascertain the Meaning of Section 5.2, the FERC Was Compelled to Support Its Interpretation with Substantial Evidence and to Consider All Relevant Evidence, Not Merely Evidence that the FERC Perceived to be Consistent with Its Interpretation.**

As this Court has consistently held, when reviewing an agency order interpreting a contract provision, the Court considers whether the contract provision is clear on its face and, if not, whether the FERC reasonably interpreted the provision based on the evidence presented. *See, e.g., Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010) ("*CIG*"); *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003). The court will consider *de novo* whether the agency could properly determine that the provision is clear on its face. *CIG* at 701. If the provision is not clear on its face, the agency's resolution of ambiguities, as with all agency determinations, must be based on substantial record evidence and may not be arbitrary or capricious. *Id.* at 701, 704-705.

As a threshold matter, the Commission's interpretive analysis clearly indicates that the agency considered the language of section 5.2 to be ambiguous. Nowhere did the Commission state that its findings were based upon the plain language of the JOA. Responding to arguments that trade usage evidence should have been considered, the Commission determined to review both contextual and course of performance evidence, a course that would be necessary only to resolve

18

an ambiguity in the disputed provision.[10]   Indeed, the FERC stated that it was

relying on <u>both</u> contextual and extrinsic (course of performance) evidence to "aid

in the Commission's interpretation" and "resolve an ambiguity."[11]   That the parties

offered diametrically opposed, yet reasonable interpretations of section 5.2 also is,

in and of itself, an indication of ambiguity.  *See, e.g.*, *Central States, Southeast &*

*Southwest Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir. 1996)

("When parties suggest different, yet reasonable interpretations of a contract, the

contract is ambiguous.") (citing *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d

560, 565 (7th Cir. 1995); *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986

F.2d 580, 586 (1st Cir. 1993)).

Additionally, the FERC specifically noted that the term "contract path" was

"not defined" in the JOA.  This omission led the FERC to search for other clues,

beyond the language of the provision, in order to determine the parties' intentions.

The FERC indicated that when interpreting an ambiguous contract, common law

precedent recognizes a qualitative hierarchy regarding extrinsic evidence, favoring

"examination of express terms of a contract and course of performance, over usage

---

[10]      Rehearing Order at P 21 (R.84, JA__).

[11]      *Id.* (R.84, JA__).

19

of trade."[12]   On this basis, the FERC rationalized the exclusion of other proffered evidence.

Having determined the provision was susceptible to more than one interpretation, the Commission was bound to fairly consider *all* the evidence and to confront *all* specific arguments to ascertain the proper meaning of the disputed phrase "contract path to the same entity."  *El Paso Elec. Co. v. FERC*, 201 F.3d 667, 672 (5th Cir. 2000) ("FERC's arbitrary refusal to evaluate relevant evidence . . . violates both the APA and possibly FERC's own procedural rules.").  As next discussed, the Commission failed this charge by selectively focusing only on evidence consistent with MISO's interpretation and "declin[ing] to consider" contrary evidence presented by SPP.

### a.    The "Course of Performance" Evidence Relied Upon by the Commission Supports the Exact Opposite Conclusion Reached Regarding the Intended Purpose of Section 5.2.

The Commission sought to interpret section 5.2 by first looking to a prior transaction that the FERC determined to be relevant "course of performance" evidence.  The problem with the FERC's analysis is that its understanding of the prior transaction was wrong.  As SPP made clear in seeking rehearing, the FERC was correct only insofar as it properly described the prior transaction as one

---

[12]     Rehearing Order at P 21 (citing Restatement (Second) of Contracts § 203 (1981)) (R.84, JA__).

involving MISO's invocation of section 5.2.  The FERC, however, was incorrect that the transaction involved use of SPP's contract path capacity *to serve MISO's internal load*, as in the instant case.  To the contrary, the prior transaction merely allowed MISO to utilize SPP's system to reach *a third party* (coincidentally, Entergy Arkansas), a non-member of MISO at the time to which both SPP and MISO had contract paths (i.e., "contract paths to the same entity") as required by the JOA.  MISO, in turn, was then able to deliver energy to a portion of MISO's internal load, via separate transmission arrangements between that third party and MISO, not via any direct connection between SPP and the internal MISO load.  SPP was not interconnected with the internal MISO load in question and therefore could not have agreed that section 5.2 could be used for service to that internal MISO load, as the FERC found.[13]

More specifically, and as the schematic map below illustrates,[14] SPP had a physical contract path to Entergy (a third party), which, under SPP's interpretation of section 5.2, MISO was free to use.  MISO also had a contract path to Entergy

---

[13]     *See* SPP Rehearing Request at 8-9 (R.77, JA__).

[14]     The schematic is not to scale and does not purport to depict the exact geographic configuration of the represented utilities.  It is provided for illustrative purposes to demonstrate  uncontested facts from the record below and, specifically, the absence of any contract or physical path between SPP and the internal MISO load in question (i.e., Ameren, an internal MISO member) served by MISO in the prior transaction relied upon by the Commission.

21

Arkansas (the third party) – it was connected to Entergy Arkansas via an Interchange Agreement governing the shared use of a transmission line and a set of transformers between the systems of Ameren, a MISO member, Associated Electric Cooperative, Inc. ("AECI"), and Entergy.[15] Under this Interchange Agreement, MISO had the right to use 1,000 megawatts of those interchange facilities to reach the common third party, Entergy Arkansas. The Interchange Agreement thus gave MISO a "contract path" to Entergy Arkansas. Therefore, as things existed at the time of the FERC's example, SPP and MISO had contract paths to the same *third party* entity, Entergy Arkansas. This made the sharing provisions of section 5.2 applicable to these paths. When, in 2009, the contract path created by the Interchange Agreement was temporarily out of service, section 5.2 properly allowed MISO to request, and SPP to agree, to the use of SPP's path *to the third party, Entergy Arkansas.*[16] See Schematic, below.

---

[15]     *See* Monroe Aff. ¶ 12 (R.41, JA__).

[16]     Petition for Declaratory Order, Request for Shortened Notice Period, and Request for Expedited Treatment of Midwest Independent Transmission System Operator, Inc., Docket No. EL11-34-000, at Exhibit D, Affidavit of Thomas J. Mallinger on Behalf of the Midwest Independent Transmission System Operator, Inc. ¶ 13 (Apr. 8, 2011) ("Mallinger Aff.") (R.1, JA__).



As can be seen in the schematic, MISO and SPP had contract paths to the same entity, Entergy Arkansas. MISO's contract path enabled it to reach a portion of MISO load (a piece of Ameren) that was radially connected only to the Entergy Arkansas system. But SPP had no contract path connecting it to the Ameren radial load in question; that portion of MISO load was accessible only via the Entergy Arkansas system. SPP was neither contractually nor physically connected to that load.

To be sure, in the prior transaction, MISO's ultimate goal was to reach some of MISO's own load radially connected to Entergy Arkansas. But section 5.2 had nothing to do with reaching that load. SPP has no contract path "to" that Ameren load, and it could not have agreed to deliver energy to it via section 5.2. Necessarily, MISO had to reach that load using separate, independent

23

arrangements with Entergy.  Despite the uncontested representation of these facts on the record below,[17] the Commission chose not to answer the relevant question – i.e., whether this earlier transaction involved MISO's use of SPP contract path capacity "to" internal MISO load, or, as SPP showed, "to" Entergy, a third party?

Thus, far from supporting the Commission's interpretation, the cited course of performance example actually undercuts it.  Indeed, because the example only involved use of contract path capacity to a third party, Entergy, it supports SPP's interpretation of section 5.2, not MISO's.  SPP agreed that its system could be used to transmit energy from MISO to Entergy because Entergy was a third party entity to which both MISO and SPP had "contract paths."

In response to SPP's argument, all the FERC would say is that MISO was using section 5.2 to serve "Ameren's network load," which, in FERC's view, demonstrated that the parties believed section 5.2 could be used to serve internal MISO load (like the internal Entergy Arkansas load that would be served under MISO's interpretation of 5.2 after Entergy Arkansas joins MISO).  Rehearing Order at P 20 (R.84, JA__).  But this *non sequitur* response simply begs the question and side-steps entirely the plain fact that SPP was *not* interconnected with the Ameren load in question, had no "contract path to" that Ameren load, and

---

[17]     *See* SPP Rehearing Request at 8-9 (R.77, JA __); Mallinger Aff. ¶ 13 (R.1, JA__).

could not have used section 5.2 to deliver MISO energy to that load.   The Commission's response answered a different, and entirely irrelevant, question, namely: was MISO *ultimately able to reach* internal load by using contract path capacity *to a third party*?

If the FERC were intent on analogizing to the instant dispute, it would have understood that once Entergy Arkansas becomes part of the MISO system, MISO will not have a contract path "to" Entergy Arkansas; the Entergy Arkansas loads will be an internal part of MISO's system.  MISO cannot have a contract path "to" itself since there is no need for MISO (or any transmission provider) to designate a "contract path" with receipt and delivery points to move power from resources on its own system to its own system load.   In addition, all of SPP's prior paths to Entergy Arkansas will be paths "to" MISO (of which Entergy Arkansas will now be a part).  At that point, no SPP contract path to Entergy Arkansas will exist.  The FERC committed clear legal error by failing to confront and provide a rational response to these arguments.  *PSEG Energy Res. & Trade LLC v. FERC*, 360 F.3d 200, 205 (D.C. Cir. 2004) ("FERC's failure to respond cogently to [petitioner's] argument . . . requires granting the company's petition").

b.     **The Consideration of Course of Performance Evidence, to the Exclusion of Other Proffered Extrinsic Evidence, Is Arbitrary and Capricious.**

Given the determination that the JOA provision was unclear and required consideration of extrinsic evidence, the FERC was required to give meaningful consideration to all relevant evidence submitted about its meaning.  SPP presented extensive evidence of the usage in the industry of the term "contract path," including usage of the term by well-recognized industry boards such as the North American Electric Reliability Corporation ("NERC") and the North American Energy Standards Board ("NAESB").  Indeed, SPP offered evidence of MISO's own use of the term, and the FERC's use as well.  In response, the FERC stated that because it had other evidence available (including its erroneous view of a single course of performance event), it "decline[d] to consider" SPP's evidence.

The Commission's failure to confront the trade usage evidence and argument that SPP presented was arbitrary and capricious.  *See Colo. Interstate Gas Co.*, 599 F.3d at 703 ("[C]onstruing terms in light of their commonly understood meaning is a hallmark of reasonable interpretation").   FERC's statement that course of performance evidence is entitled to "greater weight" cannot justify giving *no* weight or consideration to SPP's trade usage evidence.  Moreover, giving weight *only* to course of performance evidence is particularly arbitrary when the evidence relied upon consists of a single event over the seven

26

year history of the contract.  As a general proposition, course of performance

evidence to be relevant requires repeated occasions and a pattern of conduct; a

single transaction does not constitute "course of performance."  *See* Restatement

(Second) of Contracts § 150, cmt. e (1981); *see also* U.C.C. §2-208 (2011); *accord*

*Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 40 F.3d 1474, 1492 (5th Cir. 1995).

Thus, the FERC's reliance on an isolated – and improperly understood – incident,

to the exclusion of other evidence, is not a rational basis for concluding that MISO

could use section 5.2 to serve internal MISO load.

   **2.     Proper Consideration of SPP's Proffered Evidence Would Have
           Demonstrated the Error in the Commission's Interpretation of
           Section 5.2.**

       **a.     Disregarded Trade Usage and Industry Practice Evidence
               Comports with SPP's Interpretation.**

       The term "contract path," as commonly used within the industry, is a

designated path over which two independent parties engage in point-to-point

transmission service transactions.  This is confirmed by multiple sources intimately

involved in the electric industry.   NERC, the entity responsible for electric

reliability standards, defines contract path as "[a]n agreed upon electrical path for

the continuous flow of electrical power *between the parties of an Interchange*

27

*Transaction*."[18]   The import of the italicized language, which the Commission declined to consider, is critical:   an Interchange Transaction, by definition, constitutes an arrangement for the transfer of energy across one or more Balancing Authority Areas and, therefore, is necessarily a point-to-point transaction between regions.[19]   Once Entergy Arkansas is a part of the MISO system, all power flows serving Entergy Arkansas load within the MISO region will take place within the single balancing authority that has been established by MISO.   This trade understanding of the term "contract path" lays bare any notion that MISO will have a "contract path" "to" Entergy Arkansas load, once that load is internal to MISO.

NAESB, an industry resource responsible for promulgating utility business practice standards, has adopted a definition of "contract path" similar to that of NERC.   NAESB defines a "contract path" as "between contiguous Transmission Service Providers."[20]   Since MISO and Entergy Arkansas will not be "contiguous Transmission Service Providers" following Entergy Arkansas's integration into the

---

[18]     Glossary of Terms Used in NERC Reliability Standards, NERC, 13 (May 25, 2012), http://www.nerc.com/page.php?cid=2/20/283 (emphasis added), cited in SPP Protest at 35 (R.41, JA __).

[19]     *See* Glossary of Terms Used in NERC Reliability Standards, NERC, 25 (May 25, 2012), http://www.nerc.com/page.php?cid=2/20/283.

[20]     NAESB Wholesale Electric Quadrant Business Practice Standards, Version 002.1 (booklet dated March 11, 2009 with minor corrections applied through December 14, 2009), Definition of Terms, section 008-010, cited in SPP Protest at 36 (R.41, JA __).

28

MISO system, the Commission's interpretation of section 5.2's reference to "contract path" is plainly at odds with standard industry convention.  Rather than attempt to rationalize or explain this inconsistency, the FERC simply chose to ignore entirely SPP's trade usage evidence.

Finally, had the FERC looked to MISO's own business practices, as SPP urged, it would have recognized that MISO itself distinguishes between flow-based services such as internal market or network transmission services, and contract path services, which are more closely associated with point-to-point transmission to third parties.  Contract path principles are only recognized for transactions between MISO and other Balancing Authority Areas where a physical connection exists between the transacting parties.[21]  Thus, as with NERC and NAESB definitions, MISO's business practices are incompatible with the notion that a "contract path" can exist between MISO and MISO's own embedded load.  In simplest terms, and consistent with commonly understood, trade-use, definitions, a transmission provider cannot have a "contract path" to itself.

_____

[21]    MISO, BPM-013-r6, Business Practice Manual for Module B of the Open Access Transmission, Energy and Operating Reserve Markets Tariff § 4.3, https://www.midwestiso.org/Library/BusinessPracticesManuals/Pages/BusinessPracticesManuals.aspx (Effective Apr. 23, 2012, last visited Sept. 17, 2012), cited in SPP Protest at 37 (R.41, JA__).

We have no way of knowing how the FERC would react to any of this important evidence because FERC simply "decline[d] to consider" it.  A hearing on the subject would have enabled a proper exploration of the industry usage of the terms, but regardless whether the FERC needed to conduct a hearing, it plainly could not simply decline to consider relevant extrinsic evidence of the meaning of the contract.  That is clearly reversible error, as the Commission must address evidence and argument presented to it.  *PSEG Energy Res. & Trade LLC*, 360 F.3d at 205; *see also Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1137 (D.C. Cir. 1991) (reversing summary contract interpretation ruling, based on the Court's finding that "the contract language is ambiguous and the Commission should have inquired further by permitting petitioner to put in evidence of the negotiating background").

> **b.   Disregarded Sworn Evidence by SPP's Principal JOA Negotiator Directly Contradicts the FERC's Interpretation of Section 5.2.**

The Commission also "decline[d] to consider" an affidavit submitted by SPP's Executive Vice-President, Mr. Carl Monroe, who testified, first-hand, that SPP personnel involved in the negotiation of the JOA understood that section 5.2 referred to contract paths to third parties and that at no time did MISO advocate a

contrary interpretation.[22]  The FERC responded that Mr. Monroe's affidavit was "arguably course of dealing evidence," Rehearing Order at P 23 (R.84, JA__), that was properly ignored in favor of "course of performance" and "contextual" evidence.

As in the case of the industry practice evidence, the FERC is not permitted simply to ignore tendered evidence.  To the contrary, evidence of contracting parties' actual intentions is arguably the most consequential extrinsic evidence in determining the meaning of an ambiguous contract.  *See Southwestern Elec. Coop. v. FERC*, 347 F.3d 975, 983 (D.C. Cir. 2003) (noting the Commission's routine reliance on "direct knowledge" testimony to ascertain contractual intent); *see also Cajun Elec. Power Coop.*, 924 F.2d at 1137 (commenting on the appropriateness of considering the "background of negotiations between the parties" to resolve contractual ambiguities).  The FERC cannot blithely ignore submitted evidence.

While refusing to consider the affidavit, the FERC gratuitously observed that the affidavit was contrary to evidence regarding implementation of an allegedly similar agreement between MISO and PJM ("MISO-PJM JOA").  MISO argued, and the Commission seemingly accepted, that because MISO and PJM interpreted the MISO-PJM JOA to permit use of contract path capacity to serve internal load,

---

[22]    Monroe Aff. ¶ 15 (R.41, JA__).

the same interpretation "should" prevail in the MISO-SPP context. In the FERC's somewhat equivocal opinion, the MISO-PJM JOA example "suggest[s] that at the time the SPP JOA was negotiated, both MISO and SPP knew that the capacity sharing provision in section 5.2 [] has been used to serve members of MISO and PJM, and not just third parties." Rehearing Order at P 23 (R.84, JA__).

The problem with the FERC's short-shrift analysis is that it uncritically accepts MISO's assertions regarding what SPP knew or should have known, in the face of conflicting evidence that revealed these assertions to be entirely inaccurate. SPP was not privy to the MISO-PJM JOA and had no part in the implementation of the provisions governing contract path  sharing rights between MISO and PJM. Moreover, that different parties to a different contract may have administered a provision similar to section 5.2 in the manner urged by MISO is hardly dispositive. Identical language in different contracts can be interpreted to have different meanings, depending on the parties' intentions. *See Pennzoil Co. v. FERC*, 645 F.2d 360, 386 (5th Cir. 1981). With MISO and SPP on record with conflicting interpretations, and with the FERC's own analysis indicating ambiguity, the Commission cannot selectively rely on MISO's evidence to the exclusion of even considering other evidence in deciding the import of section 5.2.

32

### 3.   The FERC's "Contextual" Analysis of Section 5.2 Does Not Support and, in Fact, Undercuts FERC's Conclusion.

The FERC also defends its interpretation of section 5.2 based on the "context" in which the provision appears in the JOA.  In the Commission's view, such "context" contemplates MISO dispatching its market through its internal network service to serve its internal load, while using SPP's transmission system to enable MISO to dispatch its market in this fashion.  The FERC further rationalizes that section 5.2's reference to "physical and contractual" interconnections suggests that the provision was not limited to "contract" paths "to" third parties.  On both counts, the Commission's logic is unpersuasive.

First, SPP argued below that section 5.2 is found in a section of the JOA dealing with coordinated data exchanges necessary to determine the amount of capacity available for *point-to-point* transmission service.[23]  Yet under the Commission's interpretation of section 5.2, MISO will be authorized to place on SPP's system flows arising from network service used to dispatch its market to serve network load, not flows arising from point-to-point service.  This is significant because, as SPP argued below, without challenge, when MISO dispatches its energy market, it does so using its *network service* transmission

---

[23]     SPP Protest at 34-35 (R.41, JA__); Monroe Aff. ¶¶ 12-19 (R.41, JA__); SPP Rehearing Request at 13 (R.77, JA__).

33

capabilities.  *See* SPP Protest at 8, 35 (R.41, JA___).  So, if Entergy Arkansas were a member of MISO participating in the MISO market, it would do so via network service internal to MISO.  Inasmuch as the Commission itself has held that "[n]etwork service has no identified contract path,"[24] the only logical inference to draw from the "context" of section 5.2 is that its reference to "contract path" is intended to permit shared use of capacity to reach third parties, not to serve network-dependent load internal to MISO and/or SPP.

Similarly unavailing is the Commission's reliance on section 5.2's reference to "physical[] or contractual[] interconnect[ions]" as the basis for defending its interpretation.  Rehearing Order at PP 18-19 (R.84, JA___).  The referenced term is found in the third sentence of section 5.2 and, very clearly, serves only to elucidate the point that the parties' contract path sharing rights, per the first sentence of section 5.2, do not create new paths that would permit either party to get access to downstream systems that are currently inaccessible due to the lack of a pre-existing physical or contract path.  The FERC is plainly wrong to conclude, without any

---

[24]   *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,241, P 1612, *order on reh'g*, Order No. 890-A, 2006-2007 FERC Stats. & Regs., Regs. Preambles ¶ 31,261 (2007), *order on reh'g and clarification*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g and clarification*, Order No. 890-C, 126 FERC ¶ 61,228 (2009), *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

explanation, that it does more, and it therefore errs in finding importance to the fact that  "both SPP and MISO would still be physically or contractually interconnected with Entergy Arkansas" after Entergy Arkansas joins MISO.  Initial Order at P 62 (R.73, JA__).  As already noted, once Entergy Arkansas is embedded within and becomes part of MISO, it cannot be said, at least not in any conventional, industry-accepted sense of the term, that MISO is "physically or contractually" connected to Entergy Arkansas.  The term "MISO" necessarily defines the system consisting of the conglomeration of MISO members, which will now include Entergy Arkansas.  MISO cannot be connected "to" itself.

### 4. The FERC's Straw-Man Argument Regarding Inferred Intentions Is Based on a Fundamental Misunderstanding of the Contract.

Another asserted ground for accepting MISO's interpretation of section 5.2 is the Commission's view that SPP's interpretation would serve "only to benefit non-member third parties."  Rehearing Order at P 20 (R.84, JA__).  The FERC determined that the RTO parties would not likely enter into an arrangement that did not offer benefits to their respective member companies.  *Id.* (R.84, JA__).

The Commission's characterization of SPP's interpretation is fundamentally flawed.  Contrary to the Commission's inference, SPP's interpretation of section 5.2 allows members of both MISO and SPP to buy from and sell to third parties by making use of the shared contract path capacity of the other RTO's transmission

system.  These are real and direct benefits to MISO and SPP, not just third parties, and precisely what one might reasonably expect the parties to have anticipated when they negotiated the JOA.

Indeed, as far as inferences go, it is the Commission's interpretation of section 5.2 that defies logic.  If the parties truly intended the "contract path" provision to permit service to the RTO's internal load, they surely would *not* have chosen language that strongly suggests contemplated shared use of contract path capacity to reach *external* points.  No sensible construction of the words "*path to*" can be reconciled with the Commission's finding that MISO can utilize SPP capacity to meet MISO's *internal* load requirements.  The FERC's interpretation illogically presumes that MISO can, for purposes of section 5.2, have a contract path to itself, since that is plainly the consequence once Entergy Arkansas becomes part of the internal MISO system.  The Commission's reasoning lacks a coherent and "rational connection between the facts found and the choices made."  *Fla. Gas Transmission Co.*, 604 F.3d at 639 (internal citations omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review, vacate the Commission's orders, and remand to the Commission with instructions to reconsider the meaning of JOA section 5.2 and to issue an order based on substantial evidence.

/s/    *Barry S. Spector*

Barry S. Spector
Jeffrey G. DiSciullo
Wright & Talisman, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3802
(202) 393-1200 Telephone
(202) 393-1240 Facsimile

Attorneys for
Southwest Power Pool, Inc.

Dated:  October 2, 2012

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,819 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

## <u>ADDENDUM</u>
## <u>Relevant Statutory Provision</u>

Federal Power Act, 16 U.S.C. § 825*l*

**16 U.S.C. §825l. Review of orders**

**(a) Application for rehearing; time periods; modification of order**

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Judicial review**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence,

2

shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, and Rule 25 of the Circuit Rules of this Court, I hereby certify that I have served the Opening Brief of Petitioner Southwest Power Pool, Inc. upon the Court, and each party to the proceeding, as listed on the Service List below.

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| Carol Jayne Banta<br>Federal Energy Regulatory Commission<br>(FERC) Office of the Solicitor<br>888 First Street, NE<br>Washington, DC 20426<br>Email: Carol.Banta@ferc.gov | 12-1158 | Email | Active |
| Sean Thomas Beeny<br>Miller, Balis & O'Neil, PC<br>1015 15th Street, NW<br>12th Floor<br>Washington, DC 20005-2605<br>Email: sbeeny@mbolaw.com | 12-1158 | Email | Active |
| Gregory W Camet<br>Entergy Services, Inc.<br>Suite 200 East<br>101 Constitution Avenue, NW<br>Suite 200E<br>Washington, DC 20001-0000<br>Email: gcamet@entergy.com | 12-1158 | Email | Active |
| Barry Cohen<br>Miller, Balis & O'Neil, PC<br>1015 15th Street, NW<br>12th Floor<br>Washington, DC 20005-2605<br>Email: bcohen@mbolaw.com | 12-1158 | Email | Active |

| | | | |
|---|---|---|---|
| Ryan James Collins<br>Wright & Talisman, PC<br>1200 G Street, NW<br>Suite 600<br>Washington, DC 20005-1200<br>Email: collins@wrightlaw.com | 12-1158 | Email | Active |
| Amanda Riggs Conner<br>American Electric Power<br>Suite 320<br>801 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Email: arconner@aep.com | 12-1158 | Email | Active |
| David W. D'Alessandro<br>Stinson Morrison Hecker LLP<br>1775 Pennsylvania Avenue, NW<br>Suite 800<br>Washington, DC 20006<br>Email: ddalessandro@stinson.com | 12-1158 | Email | Active |
| N. Beth Emery<br>Husch Blackwell, LLP<br>755 East Mulberry Street<br>Suite 200<br>San Antonio, TX 78212<br>Email: beth.emery@huschblackwell.com | 12-1158 | Email | Active |
| Matthew Allen Fitzgerald<br>McGuireWoods LLP<br>One James Center<br>901 East Cary Street<br>Richmond, VA 23219-4030<br>Email: mfitzgerald@mcguirewoods.com | 12-1158 | Email | Active |
| Stephen Gerard Kozey<br>Midwest Independent Transmission System Operator, Inc.<br>720 City Center Drive<br>Carmel, IN 46032<br>Email: stevekozey@misoenergy.org | 12-1158 | Email | Active |

| | | | |
|---|---|---|---|
| Cortney Madea<br>NRG Energy, Inc.<br>211 Carnegie Center Drive<br>Princeton, NJ 08540<br>Email: cortney.madea@nrgenergy.com | 12-1158 | Email | Active |
| Gary James Newell<br>Thompson Coburn LLP<br>1909 K Street, NW<br>Suite 600<br>Washington, DC 20006-1167<br>Email: gnewell@thompsoncoburn.com | 12-1158 | Email | Active |
| Abraham Silverman<br>NRG Energy, Inc.<br>211 Carnegie Center Drive<br>Princeton, NJ 08540<br>Email: abraham.silverman@nrgenergy.com | 12-1158 | Email | Active |
| Robert Harris Solomon<br>Federal Energy Regulatory Commission<br>(FERC) Office of the Solicitor<br>Room 9A-01<br>888 First Street, NE<br>Washington, DC 20426<br>Email: robert.solomon@ferc.gov | 12-1158 | Email | Active |
| Barry Stewart Spector<br>Wright & Talisman, PC<br>1200 G Street, NW<br>Suite 600<br>Washington, DC 20005-1200<br>Email: spector@wrightlaw.com | 12-1158 | Email | Active |
| Rebecca L. Sterzinar<br>Thompson Coburn LLP<br>1909 K Street, NW<br>Suite 600<br>Washington, DC 20006-1167<br>Email: rsterzinar@thompsoncoburn.com | 12-1158 | Email | Active |

3

| | | | |
|---|---|---|---|
| Noel Harlan Symons<br>McGuireWoods LLP<br>2001 K Street, NW<br>Suite 400<br>Washington, DC 20006-1040<br>Email: nsymons@mcguirewoods.com | 12-1158 | Email | Active |
| Stephen L. Teichler<br>Duane Morris LLP<br>505 9th Street, NW<br>Suite 1000<br>Washington, DC 20004-2166<br>Email: slteichler@duanemorris.com | 12-1158 | Email | Active |
| Robert A. Weishaar Jr.<br>McNees, Wallace & Nurick<br>777 North Capitol Street, NE<br>Suite 401<br>Washington, DC 20002-0000<br>Email: rweishaa@mwn.com | 12-1158 | Email | Active |
| Marie Denyse Zosa<br>Stinson Morrison Hecker LLP<br>1775 Pennsylvania Avenue, NW<br>Suite 800<br>Washington, DC 20006<br>Email: dzosa@stinson.com | 12-1158 | Email | Active |

/s/   *Barry S. Spector*

Barry S. Spector
Jeffrey G. DiSciullo
Wright & Talisman, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3802
(202) 393-1200 Telephone
(202) 393-1240 Facsimile

Attorney for
Southwest Power Pool, Inc.

Date:  October 2, 2012